UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re WOLVERINE, PROCTOR &          )
SCHWARTZ, LLC,                      )
                                    )
          Debtor.                   )
                                    )
------------------------------      )
                                    )
PETER A. CRAWFORD,                  )
                                    )
          Appellant,                )
          Cross-Appellee,           )     CIVIL ACTION NO.
                                    )     12-11983-DPW
                                    )
RILEY LAW GROUP LLP, JANET          )
E. BOSTWICK, P.C., and              )
VERDOLINO & LOWEY, P.C.,            )
                                    )
          Appellees,                )
          Cross-Appellants.         )


MEMORANDUM AND ORDER
March 26, 2015

     Before me are cross appeals from an order of the bankruptcy
court regarding fees requested by the Trustee, her counsel, and
her professionals.  Two aspects of the bankruptcy court's order
on Applications for Compensation are at issue.  In one, an
unsuccessful claimant challenges the award of fees and costs
incurred by the Trustee in the defense against his claim.  In
the other, the Trustee challenges the reduction in compensation
for unsuccessfully opposing the claim of the primary debt

- 1 -

holder; the unsuccessful claimant, who was not directly involved in that matter, supports reduction.

Appellant Peter Crawford lost his substantive claim for violation of an employment contract he brought against the bankrupt company at every relevant outpost of the federal court system - in the Bankruptcy Court, in this court, before the United States Court of Appeals for the First Circuit, and - through denial of his application for certiorari and denial of his application for rehearing on the denial of certiorari - in the Supreme Court of the United States. Using the foothold provided by a *de minimis* claim in the bankrupt estate he acquired after losing his own claim with finality, Mr. Crawford now brings this appeal seeking to deprive the Trustee, her counsel, and her experts of professional fees incurred in the defense of the extended litigation initiative he pursued.

The Trustee and her professionals, for their part, appeal the bankruptcy court order reducing their fees in connection with litigation – unrelated to the *Crawford* matter – against Tencara, LLC, which acquired secured debt as the result of a recapitalization transaction. The Trustee pursued the *Tencara* litigation on the basis that the lender could properly be characterized as an insider and knew the debtor was undercapitalized. Mr. Crawford supports the reduction the

bankruptcy court ordered in the Trustee's compensation for the *Tencara* litigation.

## I. BACKGROUND

The Debtor, Wolverine, Proctor & Schwartz ("WPS"), LLC, designed and manufactured custom industrial equipment, such as ovens and drying equipment, for the food and other industries. Mr. Crawford served as the Chief Operating Officer of the Debtor's predecessor, WPS, Inc., from 1999 until 2002. On January 12, 2005, Mr. Crawford filed a complaint against WPS, Inc. in this court alleging breach of contract for failure to pay a bonus set out in the employment agreement between Mr. Crawford and WPS, Inc. *Crawford* v. *Wolverine, Proctor & Schwartz, Inc.*, Civ. Action No. 05-10078-DPW (D. Mass.) (Compl., Jan. 12, 2005, Dkt. No. 1). While that action was pending, WPS, LLC - which acquired substantially all of the operating assets and liabilities from WPS, Inc. - filed for Chapter 7 bankruptcy on April 1, 2006. *In re Wolverine, Proctor & Schwartz, LLC*, No. 06-10815-JNF (Bankr. D. Mass.) (Voluntary Petition, Apr. 1, 2006, Dkt. No. 1).

I dismissed all active motion practice in the breach of contract litigation before me without prejudice pending the outcome of the bankruptcy proceeding. *Crawford*, Civ. Action No. 05-10078-DPW, 2006 WL 2121747, at *1 (D. Mass. July 21, 2006).

Mr. Crawford thereafter filed his claims in the bankruptcy court and pursued them unsuccessfully through bankruptcy proceedings.[1] Meanwhile, the Trustee unsuccessfully pursued litigation on behalf of the bankruptcy estate against Tencara. Ultimately, on September 10, 2012, the bankruptcy court confirmed the Trustee's Final Report and ruled on fee applications from the Trustee, her counsel, and her professionals, as described below. *See In re Wolverine*, No. 06-10815-JNF, 2012 WL 3930360, at *1-2 (Bankr. D. Mass. Sept. 10, 2012).

The cross appeals before me regarding the compensation rulings of the bankruptcy court involve a complex factual and procedural history involving a number of different but related litigation matters and a variety of claims and objections in the bankruptcy proceeding. This history falls broadly into two categories, each of which I briefly summarize below.

---

[1] The *Crawford* litigation was pursued to conclusion as a bankruptcy proceeding. It was resolved by me as Civ. Action No. 07-10279-DPW (D. Mass.), upon withdrawal of the reference of the *Crawford* dispute. Meanwhile, the bankruptcy court continued to administer the bankruptcy generally under No. 06-10815-JNF (Bankr. D. Mass.). I consolidated the withdrawal of reference in the bankruptcy matter concerning Mr. Crawford's bankruptcy claim with Mr. Crawford's initial complaint in this court, Civ. Action No. 05-10078-DPW. Mr. Crawford thereafter filed a separate action asserting a *quantum meruit* theory to pursue his claim, Civ. Action No. 08-10048-DPW, which was consolidated with Civ. Action Nos. 05-10078-DPW and 07-10279-DPW. *See Crawford* v. *Wolverine, Proctor & Schwartz, Inc.*, Civ. Action No. 08-10048-DPW (D. Mass.) (Order re: Consolidation, Sept. 2, 2008, Dkt. No. 44).

## A. *The 2001 Recapitalization and the* Crawford *Litigation*

In 2001 – while Mr. Crawford was acting as Chief Operating Officer – WPS, Inc. recapitalized.  In that transaction, three related private equity funds invested $14 million in a new entity called WPS, LLC, which would later acquire the operating assets and liabilities of its predecessor, WPS, Inc.  Citizens Bank of Massachusetts accepted $11.5 million of this investment in satisfaction of approximately $21.5 million of debt.  As a result, WPS, Inc. saw an approximately $10 million gain that formed the basis of Mr. Crawford's breach of contract action.

According to Mr. Crawford's employment agreement, he was entitled to a yearly bonus equal to five percent of the profitability of WPS, Inc.  The formula set out in the agreement to measure profitability includes, as one of its variables, "EBITDA," meaning <u>E</u>arnings <u>B</u>efore <u>I</u>nterest, <u>T</u>axes, <u>D</u>epreciation, or <u>A</u>mortization.  The dispute in Mr. Crawford's breach of contract action and subsequent claims centered on the meaning of "Earnings" as used in "EBITDA."  Under the definition that WPS advanced, earnings means operating income.  Under the definition that Mr. Crawford advanced, earnings means net income.  This distinction was vital because under the WPS definition, Mr. Crawford would be entitled to no bonus, whereas under Mr. Crawford's definition, his bonus would be substantial.  Indeed,

in his bankruptcy claim, Mr. Crawford sought $885,582.37 and treble damages.

In preparation for the 2008 trial in the matter, which I conducted upon the withdrawal of the reference to the bankruptcy court, the Trustee engaged Keith Lowey of Verdolino & Lowey, P.C. ("V&L") as an expert witness. Mr. Lowey prepared an expert report asserting that "[f]or purposes of computing EBITDA . . . Earnings . . . is comprised of operating income . . . ." Mr. Lowey also testified consistent with this report at the 2008 trial as an expert on behalf of the Trustee. However, before submitting the case to the jury, I was forced to declare a mistrial when two jurors conducted independent internet research into the meaning of EBITDA.

Just before the 2008 trial, Mr. Crawford had sought to amend his complaint to add a new theory of recovery: *quantum meruit*. When I denied his motion, Mr. Crawford filed a separate complaint in this court based on the same operative facts, but asserting a *quantum meruit* theory. *See Crawford* v. *Wolverine, Proctor & Schwartz, Inc.*, Civ. Action No. 08-10048-DPW (D. Mass.) (Compl., Jan. 14, 2008, Dkt. No. 1). After the 2008 trial ended in a mistrial, I consolidated the actions, and the parties sought discovery on the new *quantum meruit* theory of recovery which Mr. Crawford asserted. *See id.* (Order re:

- 6 -

Consolidation, Sept. 2, 2008, Dkt. No. 44); *id.* (Scheduling Order, Sept. 2, 2008, Dkt. No. 43). The *quantum meruit* theory was a belated response to the Trustee's strategy of pursuing an alternative defense that there was no meeting of the minds sufficient to make the employment agreement binding. The additional discovery closed on December 20, 2008. Two weeks before the second trial, in 2009, both parties dropped these competing positions as to *quantum meruit*.

The second trial took place from June 15 to June 22, 2009 and resulted in a jury verdict in favor of the Trustee. Mr. Lowey did not testify during the trial. After the verdict, the Trustee moved for costs, including $417.95 for the March 27, 2007 deposition transcript of Mr. Crawford's designated expert, Mr. Georgiou, and $278.20 for the April 30, 2007 deposition transcript of Mr. Lowey. Mr. Crawford opposed the Trustee's motion for costs with respect to these two deposition transcripts on the ground that neither expert testified during the 2009 trial. At a hearing on December 3, 2009, I agreed. I accordingly ordered the award of costs requested by the Trustee less these two transcript costs. *See Crawford*, Civ. Action No.

08-10048-DPW (D. Mass.) (Memo & Order, Sept. 14, 2010, Dkt. No. 150).[2]

For his part, Mr. Crawford moved after trial for judgment as a matter of law and for a new trial.  I denied both motions. *See* Crawford v. *Wolverine, Proctor & Schwartz, Inc.*, Civ. Action No. 07-10279-DPW (D. Mass.) (Memo. & Order, Sept. 14, 2010, Dkt. No. 182).  On appeal, the First Circuit affirmed.  *See Crawford*, Nos. 10-1068, 10-1334, 10-2230 (Judgment, 1st Cir. Apr. 20, 2011).  Mr. Crawford then appealed to the U.S. Supreme Court, which denied certiorari.  *See Crawford*, 132 S. Ct. 578 (Mem.) (Nov. 14, 2011) (No. 11-304).  Undaunted, Mr. Crawford petitioned the Supreme Court for rehearing on his petition, but to no avail.  *See Crawford*, 132 S. Ct. 1079 (Mem.) (Jan. 9, 2012).

With his multi-million dollar claim as thoroughly extinguished as it conceivably could be, Mr. Crawford no longer had money at stake or standing to assert himself in any continued WPS bankruptcy proceedings.  Yet, demonstrating the fervent resilience evident throughout his litigation, Mr. Crawford purchased another's claim in the bankruptcy for $60.52, which the *bankruptcy* court concluded gave him standing to

---

[2] I address in Section IV, *infra*, Mr. Crawford's assertion of a one dollar arithmetic error in this award.

challenge the approval of the Trustee's final fee applications.
*See In re Wolverine*, 2012 WL 3930360, at *1 & n.1.

**B.    2005 *Recapitalization* and Tencara *Litigation***

In 2005, still facing financial trouble, the WPS business
was again recapitalized.  The private equity owners determined
that the most viable option for the business was to convey it
back to Deepak Kulkarni, the quondam Chief Executive Officer and
one of Mr. Crawford's adversaries in his employment agreement
litigation.  *See Riley* v. *Tencara (In re Wolverine, Proctor &
Schwartz, LLC) ("Tencara")*, 447 B.R. 1, 13-14 (Bankr. D. Mass.
2011).  Mr. Kulkarni reacquired the WPS business through a
complex transaction in 2005 involving the creation of multiple
new entities and various asset transfers.  The bankruptcy court
determined that the transaction "can best be described as a
leveraged buy-out of WPS, Inc. by entities controlled by
Kulkarni." *Id.* at 34.  In total, Mr. Kulkarni and the WPS
entities paid some $5.5 million to reacquire the business,
representing an approximately $3.5 million loan from
CapitalSource Finance, LLC and an approximately $2 million loan
from Tencara, LLC, $1.9 million of which went to WPS, LLC.  This
extinguished the $14 million debt to the private equity firms.
Also as part of this 2005 recapitalization, WPS, LLC assumed the
liabilities of WPS, Inc., including any potential liability

flowing from Mr. Crawford's litigation and subsequent bankruptcy claim, as discussed above. *Id.* at 14-17. The sole member and manager for Tencara was David Callan, who also personally funded Tencara. *Id.* at 7.

The loan from Tencara to the WPS entities was secured by all of the assets of WPS, LLC. *Tencara*, 447 B.R. at 15. Mr. Callan and Mr. Kulkarni were close personal friends and business colleagues who traveled and socialized together extensively, frequently discussed the financial and business affairs of WPS, and worked together officially at a company called Longlite, LLC, which Mr. Callan created and in which Mr. Kulkarni owned a 10% interest. *Id.* at 7, 9-10. They also regularly lent each other cash, and as a result of this and their close relationship generally, Mr. Callan conducted only limited diligence into WPS financial information before approving the loan as the manager of Tencara. *Id.* at 17.

Despite the 2005 recapitalization, WPS, LLC continued to experience financial difficulties, and in March 2006, Mr. Callan provided, at Mr. Kulkarni's request, an additional $295,000 through Tencara to cover payroll and certain other expenses. *Id.* at 21. When WPS, LLC declared bankruptcy, Tencara held a fully secured claim for approximately $1.9 million. *See id.* at 4-5. After a number of bids and offers for sale, the Trustee

sold WPS's assets to a company called CPS Holdings for $8.2 million. The bankruptcy estate also acquired $500,000 by settling a license dispute with the WPS affiliate in the United Kingdom for a total estate of approximately $8.7 million. *Id.* at 6. Tencara filed a proof of claim on July 31, 2006, asserting that WPS, LLC owed $1,896,476.67, including the remaining principal amount of the loan; all accrued and owing fees, charges, and interest; and attorney's fees and costs. *Id.* at 5.

The Trustee conducted examinations of Mr. Callan and Mr. Kulkarni pursuant to Fed. R. Bankr. P. 2004. She then brought suit against Tencara on May 1, 2007 seeking to recharacterize the Tencara loan as equity rather than debt, contending Mr. Callan should be treated as an insider. *See Tencara*, 447 B.R. at 7; *cf. Hirsh* v. *Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 263-64 (Bankr. S.D.N.Y. 2002) ("creditors with no direct relationship with the debtor (other than as creditor) may be deemed non-statutory insiders by virtue of their close personal relationship with persons who are statutory insiders"). She later amended the complaint seeking equitable subordination, contending it should have been clear at the time the loan was extended that WPS, LLC was undercapitalized. *Tencara*, 447 B.R. at 4. During the *Tencara* litigation, the Trustee's expert, Mr.

Lowey, testified that "it should have been apparent . . . that three years of deteriorating financial results . . . would leave the Debtor undercapitalized and its creditors at risk from its certain business failure." *Id.* at 22.

Tencara filed motions to dismiss both the original and amended complaints for failure to state a claim, which the bankruptcy court denied. *Tencara*, 447 B.R. at 4. The bankruptcy court also denied Tencara's motion for summary judgment on May 22, 2009, finding genuine issues of material fact regarding, among other issues, whether Mr. Callan's friendship with Mr. Kulkarni was close enough to merit treating him as an insider and whether a disinterested lender would have made a similar loan. *See id.* The Trustee represents that Tencara's settlement demands increased, despite the bankruptcy court's rulings on the dispositive motions in the Trustee's favor, and the parties were unable to reach an agreement to resolve the litigation.

After a seven-day trial from May 24 to July 6, 2010, the bankruptcy court ruled for Tencara on all counts, concluding that Mr. Callan was not an insider and that "the majority of factors, most particularly the intent of the parties, weigh heavily in favor of characterization of the advance as a loan."

*See Tencara*, 447 B.R. at 40-41.  The Trustee did not appeal this decision.

**C.    *The Fee Applications***

Following the completion of the *Crawford* and *Tencara* trials, the Trustee filed her Final Report, and she, along with her counsel and her professionals, filed final applications for compensation with the bankruptcy court for both matters.  *See In re Wolverine*, 2012 WL 3930360, at *1-2.  Mr. Crawford, relying on "his tenuous standing" based on his purchase of a claim for $60.52, filed an objection to the Final Report and the fee applications, contending that the awards granted in both the *Crawford* and *Tencara* matters should be substantially less than requested for a variety of reasons.  *Id.* at *1, *3.

The bankruptcy court held a hearing on April 12, 2012.  *Id.* at *1.  At the hearing, the court heard oral argument on the question whether Mr. Crawford had standing but not on the substance of Mr. Crawford's objection.  *Id.* at *1.  Instead, the court directed the Trustee to file a written motion to strike, and allowed Mr. Crawford three days to respond.  The court then informed Mr. Crawford:

> You've said everything that I think you need to say and I don't think you need reiterate anything else in person.  So if I allow the motion to strike, I will not consider your objection; if I deny the motions to strike I will consider your written objection.

- 13 -

The bankruptcy court issued its ruling on September 10, 2012 without holding another hearing. *Id.* at *1. The court concluded that Mr. Crawford had standing but denied his request for an evidentiary hearing on his objection, concluding that the court could rule on his objection on the papers, because "the material facts necessary to decide [the] contested matter are not in dispute" and an evidentiary hearing would be "unnecessary and unwarranted." *Id.*

After considering the fee applications and Mr. Crawford's objections, the bankruptcy court approved the requested fees for the *Crawford* litigation, including the Trustee's requested commission and expenses reimbursement and V&L's requested fees, and rejected Mr. Crawford's objection to these amounts. *Id.* at *6, *8. However, the court reduced the requested legal fees for the *Tencara* litigation by fifty percent, sustaining Mr. Crawford's objection that the fees requested were excessive. *See id.* at *6, *8. Accordingly, the court subtracted $205,106.18 from the $1,205,196.22 in compensation for legal services and reimbursement for expenses requested by the Riley Law Group LLC, and subtracted $39,840,75 from the $716,909.58 in compensation for legal services and reimbursement for expenses requested by the Trustee's counsel, Janet E. Botswick, P.C. *Id.*

at *8.  The court did not reduce V&L's fees for the *Tencara*
litigation because "its actions were directed by the Trustee and
her co-counsel."  *Id.* at *7.

## II. STANDARD OF REVIEW

A district court has jurisdiction to hear an appeal of a
decision of a bankruptcy court under 28 U.S.C. § 158(a).  A
district court reviews a bankruptcy court decision "in the same
manner" as the court of appeals would review a district court
decision.  *Casco Northern Bank* v. *DN Assocs. (In re DN Assocs.)*,
3 F.3d 512, 515 (1st Cir. 1993).  Legal conclusions are reviewed
de novo, and factual findings are reviewed for clear error.  *Id.*
"[C]onsiderable deference" is given to the "factual
determinations and discretionary judgments made by a bankruptcy
judge, such as may be involved in calculating and fashioning
appropriate fee awards."  *Id.*  Accordingly, the bankruptcy
court's quantification of fees is reviewed for abuse of
discretion.  *Sullivan* v. *Pappalardo (In re Sullivan)*, 674 F.3d
65, 68 (1st Cir. 2012) (citing *In re DN Assocs.*, 3 F.3d at 515).
Indeed, "the bankruptcy court's award of reasonable fees [is] an
area in which the court of first instance enjoys particularly
great leeway."  *Prebor* v. *Collins (In re I Don't Trust)*, 143
F.3d 1, 3 (1st Cir. 1998).  A district court or appellate court

"will set aside a fee award only if it clearly appears that the [bankruptcy] court ignored a factor deserving significant weight, relied upon an improper factor, or evaluated all the proper factors (and no improper ones), but made a serious mistake in weighing them." *In re Sullivan*, 674 F.3d at 68 (quoting *Gay Officers Action League* v. *Puerto Rico*, 247 F.3d 288, 292–93 (1st Cir. 2001)).

### III. DISCUSSION

**A.  *Legal Standard***

Section 330 of the bankruptcy code governs fee awards in bankruptcy proceedings. *See* 11 U.S.C. § 330.  That statute permits the bankruptcy court to award a Chapter 7 trustee and her professionals "reasonable compensation for actual, necessary services" and "reimbursement for actual, necessary expenses." *Id.* § 330(a)(1)(A)-(B).  An award may not include compensation for services not "reasonably likely to benefit the debtor's estate," services not "necessary to the administration of the case," or for services that are unnecessarily duplicative.  *Id.* § 330(a)(4)(A)(i)-(ii).

The compensation payable to a Chapter 7 trustee is treated as a commission, which is calculated initially using a statutory formula as a percentage of "all moneys disbursed or turned over

in the case by the trustee to parties in interest, excluding the
debtor, but including holders of secured claims." *See* 11 U.S.C.
§§ 326(a), 330(a)(3), (7). Section 326 states the maximum
percentages that may be awarded, and section 330 permits the
court to award compensation less than the amount requested. *See*
*id.* §§ 326(a), 330(a)(2). Consequently, the amount generated by
the statutory formula is not "an entitlement, nor is it presumed
to be reasonable. [Rather,] [i]t is a statutory cap that the
court is to consider as part of its reasonableness inquiry." *In*
*re Bank of New Eng. Corp.*, 484 B.R. 252, 283 (Bankr. D. Mass.
2012) (footnotes and citations omitted); *see In re Wolverine*,
2012 WL 3930360, at *4 ("a trustee's commission under § 326(a)
is not a per se entitlement to the total amount of the
commission calculated using the statutory formula, and the court
still must determine the reasonableness of the Chapter 7
trustee's commission").

An award of fees for professional services begins with a
lodestar calculation, based on the hourly rate multiplied by the
reasonable number of hours expended, and is adjusted based on a
reasonableness assessment guided by the statutory criteria. *See*
*In re Sullivan*, 674 F.3d at 69; *Coopers* v. *Lybrand (In re Bank*
*of New Eng. Corp.)*, 142 B.R. 584, 586 (D. Mass. 1992) (citing

*Boston & Maine Corp.* v. *Moore*, 776 F.2d 2, 7 (1st Cir. 1985)).

Section 330(a)(3) directs a court to "consider the nature, the extent, and the value of [the] services" provided, "taking into account all relevant factors," including "the time spent"; "the rates charged"; the reasonableness of the request compared to "the customary compensation charged by comparably skilled practitioners"; "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case"; and "whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed."[3]  11 U.S.C. § 330(a)(3).

In explaining the determination of a fee award, the bankruptcy court "need not proceed line by line through the fee

---

[3] The factors listed in 11 U.S.C. § 330(a)(3) apply to determinations of "the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person."  Compensation for a Chapter 7 trustee is noticeably absent from this list.  However, 11 U.S.C. § 326(a) provides that a Chapter 7 trustee may be awarded "reasonable compensation under section 330 . . . for the trustee's services."  Although the factors listed in § 330(a)(3) do not explicitly govern the reasonableness analysis for a Chapter 7 trustee award, at a minimum, they can inform the inquiry.  I find no error in the bankruptcy court's application of the § 330(a)(3) factors to its assessment of the reasonableness of the trustee compensation award.  *See In re Wolverine Proctor & Schwartz, LLC*, No. 06-10815-JNF, 2012 WL 3930360, at *6 (Bankr. D. Mass. Sept. 10, 2012).

application," providing a "comprehensive accounting"; it "need only be sufficiently detailed to allow a reviewing court to ascertain the trial court's thought processes and glean the basis for its award." *In re Sullivan*, 674 F.3d at 70-71 (internal quotation marks and citations omitted); *see Bogan* v. *City of Boston*, 489 F.3d 417, 430 (1st Cir. 2007).

**B.    Crawford *Litigation Fees***

I begin with my review of the bankruptcy court's award of all requested fees and expenses related to the *Crawford* litigation.  Mr. Crawford attributes error to the bankruptcy court's decision not to permit an evidentiary hearing on his objection, contending that this error requires that the record be viewed in the light most favorable to him on appeal. Substantively, Mr. Crawford contends that the Trustee went above and beyond in defending the estate against his claims – which, he implies, it should have been clear to the Trustee would be unsuccessful from the beginning — and that the costs the Trustee incurred in doing so were excessive and unnecessary. Specifically, he asserts that the bankruptcy court erred in awarding V&L expert witness fees and costs, including deposition transcript costs; that the Trustee expended unnecessary funds in taking the lead role in the defense when there were other

defendants who had a larger stake in the outcome of the case, and in advancing a "meeting of the minds" defense to Mr. Crawford's *quantum meruit* claim; that the court failed to weigh appropriately the value of the benefit to the estate against the costs of litigation and thereby gave inadequate consideration to a key factor in the reasonableness analysis; that the court failed to recognize that the duplication of effort and the disproportionality of resources between the parties made the requested fees unreasonable; and finally that the court considered improper factors in conducting its assessment.[4] The Riley firm and Botswick contend that several of Mr. Crawford's arguments may not be considered on appeal because they are waived. I address this threshold issue first before turning to Mr. Crawford's claim of error in the denial of an evidentiary hearing and then to the merits of each of his contentions.

    1.  Waiver

    After filing a notice of appeal, an appellant must file a statement of issues to be presented. *See* Fed. R. Bankr. P. 8006. If an issue is not identified in this statement, it is waived. *City Sanitation, LLC* v. *Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 91 (1st Cir. 2011).

---

[4] Because none of the parties challenge the bankruptcy court's determination that Mr. Crawford had standing, I decline to review that ruling.

- 20 -

The statement need not "be precise to the point of pedantry"; rather, "[a]n issue that is not specifically enumerated may be deemed preserved if the substance of the issue reasonably can be inferred from an issue or issues that are listed." *Id.* However, "absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." *Banco Bilbao Vizcaya Arg.* v. *Wiscovitch-Rentas (In re Net-Velazquez)*, 625 F.3d 34, 40 (1st Cir. 2010) (quoting *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59* v. *Superline Transp. Co.*, 953 F.2d 17, 21 (1st Cir. 1992)).

Mr. Crawford has satisfied the Rule 8006 requirement for all but one of his arguments:[5] that the Trustee expended unnecessary funds by taking a lead role in the *Crawford*

_____

[5] Contrary to the Trustee's contention, the other issues raised in this appeal that were not precisely described in the statement of issues are easily and appropriately inferred from the notice's general language. For instance, the Trustee argues that Mr. Crawford did not appeal the denial of his request for an evidentiary hearing. However, Mr. Crawford includes as one of the issues presented: "After a Bankruptcy Court denies a requested evidentiary hearing, does a District Court review the Bankruptcy Court's findings of fact under a clearly erroneous standard, or does it view the proffered evidence in a light most favorable to the appellant?" The substance of Mr. Crawford's objection to — and appeal from — the denial of his request for an evidentiary hearing is clear and can reasonably be inferred from the specifically enumerated issue: whether such a denial alters the standard of review. *See City Sanitation, LLC* v. *Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 91 (1st Cir. 2011).

litigation when other defendants held a larger stake in the outcome of the case. Mr. Crawford does not point to any argument he raised before the bankruptcy court that might fairly constitute the contention that the Trustee should not receive fees for taking the lead role in the *Crawford* litigation, nor can this argument be fairly inferred from the only distantly related argument in his statement of issues that the Trustee, her counsel, and her professionals unnecessarily duplicated each others' work. *See In re Net-Velazquez*, 625 F.3d at 40. Because Mr. Crawford did not raise this argument before the bankruptcy court, it is waived, and I decline to address it on appeal. *See id.* at 40-41.[6]

## 2. Denial of an Evidentiary Hearing

The bankruptcy court heard argument on the issue of Mr. Crawford's standing but considered his substantive objections to the fee requests on the papers, determining that an evidentiary hearing was "unnecessary and unwarranted" because "the material facts necessary to decide this contested matter are not in dispute." *In re Wolverine*, 2012 WL 3930360, at *1. Mr. Crawford contends that the bankruptcy court's denial of his request for an evidentiary hearing was in error, and that I

_____

[6] If I were to reach this argument, I would — as my disposition of Mr. Crawford's related issues suggests — find it to be without merit.

accordingly must consider the evidence in the light most
favorable to him.

To shape the discussion, I reiterate that my review of the
bankruptcy court's legal conclusions is *de novo* and of its
discretionary and fact-based judgments is for abuse of
discretion. *In re DN Assocs.*, 3 F.3d at 515. Under 11 U.S.C.
§ 330(a)(1)(A), a bankruptcy court may award reasonable
compensation and expenses "[a]fter notice to the parties in
interest . . . and a hearing." However, the First Circuit has
stated that "[a] hearing – much less an evidentiary hearing – is
not required in every instance." *In re I Don't Trust*, 143 F.3d
at 3 (citing 11 U.S.C. § 102(1)(A)-(B) (1993)). A bankruptcy
appellate panel of the First Circuit has interpreted *In re I
Don't Trust* to stand for the proposition that an "evidentiary
hearing is not required under § 330(a)(1)(A)" and a matter may
be heard on the papers "as long as the parties had a fair
opportunity to offer relevant facts and arguments to the court
and to confront their adversaries' submissions." *Cabral* v.
*Shamban (In re Cabral)*, 285 B.R. 563, 576 (B.A.P. 1st Cir. 2002)
(citing *In re I Don't Trust*, 143 F.3d at 3).[7]

---

[7] I recognize that in most of the cases on this issue in this
circuit, the appellant alleging error in the lack of an

The proceedings below afforded Mr. Crawford fair and ample opportunity to present his arguments and to confront the submissions of his adversaries.  Mr. Crawford has been an active participant in the bankruptcy proceeding and the corresponding litigation regarding his claims from the beginning, and he fully briefed his objections before the bankruptcy court and again in this appeal.  The bankruptcy court held a hearing on the fee applications and determined that a further evidentiary hearing was not warranted, based on its determination that no material facts were in dispute.  Mr. Crawford identifies no disputed factual issues relevant to the fee award that would suggest that this determination was in error.  He merely launches impermissible collateral attacks on issues from the *Crawford* litigation that already have been resolved against him with deadening finality.  Those issues do not justify an evidentiary hearing.  *See Miller* v. *Nichols*, 586 F.3d 53, 60 (1st Cir. 2009) ("Issue preclusion reflects the fundamental principles that courts should not revisit factual matters that a party

_____

evidentiary hearing did not request one.  This has been a basis for the denial of any error on appeal. *See, e.g., Prebor* v. *Collins (In re I Don't Trust)*, 143 F.3d 1 (1st Cir. 1998); *Cabral* v. *Shamban (In re Cabral)*, 285 B.R. 563, 576 (B.A.P. 1st Cir. 2002); *Beal Bank, S.S.B.* v. *Waters Edge Ltd. P'ship*, 248 B.R. 688, 694 (D. Mass. 2000).  Clearly, given the request for an evidentiary hearing by Mr. Crawford, the facts are different here, but they do not warrant a different result.

previously litigated and another court actually decided."). Under these circumstances, the bankruptcy court was well within its discretion to consider Mr. Crawford's fee objections on the papers.

Even if the bankruptcy court had erred in denying a hearing, the appropriate remedy is not — as Mr. Crawford imaginatively suggests — the substitution of the governing standard of review for one of his choosing. The bankruptcy court's decision to consider a matter on the papers does not alter the well-settled standards of review. If the bankruptcy court erred in this determination, the proper mechanism for correction would be to remand, not to resort to an artificial evidentiary standard construed to require all reasonable inferences in Mr. Crawford's favor. Furthermore, Mr. Crawford may not contort the denial of an evidentiary hearing into an end run around equally well-settled principles of *res judicata* and collateral estoppel in order to reopen the evidence on the substantive claims underlying the *Crawford* litigation. *See Miller*, 586 F.3d at 60. I therefore decline to alter the standard of review or reverse the bankruptcy court's determination that an evidentiary hearing was unnecessary here.

### 3.  Unnecessary Expenses: V&L Expert Witness Fees and Costs

#### a. *Expert Witness Fees*

Mr. Crawford asserts that the bankruptcy court should have
reduced the award of fees to V&L for Mr. Lowey's service as an
expert as excessive and unnecessary, because Mr. Lowey did not
testify at the 2009 trial, his testimony was "discredited," and
his expert report was "false."  Mr. Crawford further contends
that the incurring of expenses related to this expert witness
was futile where he would not ultimately testify.  This position
finds no support in the record.  In fact, the travel of the
multifront litigation Mr. Crawford has pursued demonstrates that
Mr. Crawford has failed to support these assertions time and
time again.

This is a fruitless attempt to reopen the argument
regarding the definition of EBITDA, which was tried to
completion before a jury in the *Crawford* litigation.  The jury
in the 2009 trial conclusively resolved the meaning of EBITDA
for these purposes, finding against Mr. Crawford, and
determining that his employment agreement did not include
extraordinary gains such as loan forgiveness by Citizens Bank.
Although Mr. Lowey did not testify at the 2009 trial, his expert
services surely informed the Trustee's efforts to develop and

prove her proposed definition of EBITDA, which was ultimately successful.

The Trustee's retention of Mr. Lowey as an expert through the 2009 trial, including the fees incurred in preparing him to testify, was also properly recognized by the bankruptcy court as a reasonable and necessary expense. Mr. Crawford, who was first to present his case, indicated in the pre-trial status report that he intended to call his own expert, but ultimately he did not. Until Mr. Crawford concluded his case, the Trustee could not have known whether she would have to call Mr. Lowey in response to an expert called by Mr. Crawford. In light of the jury verdict in the 2009 trial, which is entirely consistent with Mr. Lowey's position, Mr. Crawford's contention that the Trustee was "forced to abandon" Mr. Lowey's testimony because he was "discredited" at the 2008 trial is at odds with the actual course and outcome of the case. As the bankruptcy court recognized, Mr. Crawford has simply refused to acknowledge the results adverse to him throughout this litigation. *See In re Wolverine*, 2012 WL 3930360, at *6. The fees V&L accumulated were reasonable and necessary to prepare for trial in light of Mr. Crawford's representations, and the bankruptcy court appropriately awarded them.

*b. Deposition Transcript Costs*

Mr. Crawford argues that the bankruptcy court is bound by my determination not to award costs for deposition transcripts of Mr. Lowey and Mr. Georgiou, Mr. Crawford's quondam expert, because neither expert testified during the 2009 trial. *See Crawford*, Civ. Action No. 07-10279-DPW (D. Mass.) (Memo. & Order, Sept. 14, 2010, Dkt. No. 182). Accordingly, he asserts that the bankruptcy court erred in awarding the full amount of fees and costs requested, which included these transcript costs of $696.15.

The Trustee asserts that my ruling and the bankruptcy court's ruling were pursuant to different rules that are not mutually exclusive in their reach. My ruling denied the award of deposition transcript costs to the Trustee, thereby not requiring Mr. Crawford to pay them, pursuant to Fed. R. Bank. P. 7054. In contrast, the bankruptcy court's ruling allowed reimbursement of the Trustee and her professionals from the estate for the deposition transcript costs they incurred, pursuant to 11 U.S.C. § 330. I concluded under Rule 7054 that Mr. Crawford did not have to reimburse the Trustee for the deposition transcript costs; the bankruptcy court concluded under § 330 that the estate should do so. In making this

distinction, the Trustee focuses on the different standards governing the payment of deposition transcript costs under Fed. R. Bankr. P. 7054 and 11 U.S.C. § 330.

Section 1920 of Title 28 of the U.S. Code enumerates the types of costs that may be awarded pursuant to Fed. R. Bank. P. 7054, and its parallel provision, Fed. R. Civ. P. 54. That statute permits a court to tax as costs "fees for printed or electronically recorded transcripts necessarily obtained for use in the case." 28 U.S.C. § 1920(2). The First Circuit has stated that "[i]f depositions are either introduced in evidence or used at trial, their costs should be taxable to the losing party." *Templeman* v. *Chris Craft Corp.*, 770 F.2d 245, 249 (1st Cir. 1985). If the depositions were not put in evidence or used at the trial, "[i]t is within the discretion of the district court to tax deposition costs if special circumstances warrant it." *Id.* Considering whether special circumstances warrant awarding the costs does not require a departure from the statutory language. The focus is on "whether the costs were necessary to resolution of the case." *Gochis* v. *Allstate*, 162 F.R.D. 248, 251 (D. Mass. 1995) (emphasis added); *see also Rodriguez-Garcia* v. *Davila*, 904 F.2d 90, 100 (1st Cir. 1990) ("If costs were reasonably necessary to the maintenance of the

action, then they are allowable."). Indeed, an assessment of
the necessity of the deposition and the acquisition of the
deposition transcript has guided courts' analysis after
*Templeman*. *See, e.g.*, *Papas* v. *Hanlon*, 849 F.2d 702, 704 (1st
Cir. 1988); *Roggio* v. *Grasmuck*, 18 F. Supp. 3d 49, 61 (D. Mass.
2014). However, the burden is on the party requesting the
deposition transcript costs to explain why acquiring the
transcripts was necessary. *See Roggio*, 18 F. Supp. 3d at 61;
*Hillman* v. *Berkshire Med. Ctr., Inc.*, 876 F. Supp. 2d 122, 127-
28 (D. Mass. 2012).

　　This analysis under Fed. R. Bankr. P. 7054 is not
meaningfully different on its face from that involving the award
of costs under 11 U.S.C. § 330, which permits the award of
"reasonable compensation for actual, <u>necessary</u> services" and
"reimbursement for actual, <u>necessary</u> expenses." 11 U.S.C.
§ 330(a)(1)(A)-(B) (emphasis added). Section § 330(a)(4)(A)
specifically excludes from such an award services that are not
"necessary to the administration of the case."

　　I conducted this analysis on a withdrawal of the reference
to the bankruptcy court and found that the deposition costs were
not necessary to the maintenance of the action; therefore, I
concluded that Mr. Crawford would not be required to pay the

cost to the Trustee.  The Trustee had a fair opportunity to contest this ruling directly and chose not to do so.  Instead, she returned to the bankruptcy court to contend effectively that this reasonableness and necessity determination was incorrect. In doing so, the Trustee sought the very same costs as reasonable and necessary, despite my earlier conclusion — binding on the bankruptcy court — that they were not.  That she sought to be reimbursed by the estate for them, rather than by Mr. Crawford, is in this setting immaterial.

I conclude that the Trustee and her professionals are — as a practical matter — estopped from challenging the necessity or propriety of an award of costs for these transcripts in this proceeding.  *Cf*. *Rodriguez-Garcia* v. *Miranda-Marin*, 610 F.3d 756, 770 (1st Cir. 2010).  It has long been established that "where the trustee in bankruptcy unsuccessfully litigates an issue outside the bankruptcy court, the decision against him is binding in the bankruptcy court." *Heiser* v. *Woodruff*, 327 U.S. 726, 733-34 (1946).  The issue of the necessity of the deposition transcript costs has already been litigated and decided by me on the merits after a full and fair opportunity for the Trustee and her professionals to be heard in this bankruptcy litigation.  *See Crawford*, Civ. Action No. 07-10279-

DPW (D. Mass.) (Memo. & Order, Sept. 14, 2010, Dkt. No. 182). The Trustee and her professionals chose not to offer any opposition to Mr. Crawford's objection to the award of costs at that time. *Id.*

Because I conclude the Trustee was effectively precluded from relitigating — at least without seeking reconsideration by me — the issue of the necessity of the deposition costs in the bankruptcy proceeding through her fee application, I conclude the bankruptcy court erred by permitting the reopening of this issue and including these fees in its award.

### 4. Unnecessary Expense: The Meeting of the Minds Defense

Mr. Crawford contends that the bankruptcy court should have considered the "lack of meeting of the minds" defense that the Trustee asserted to be unnecessary and to have generated equally unnecessary discovery. Consequently, he contends that the bankruptcy court erred in including costs for mounting this defense of the fee award. The bankruptcy court included these expenses and services in the fee award when it held that "the services rendered by the Trustee, her co-counsel and her accountant, in objecting to Crawford's improper claim were necessary and the fees they incurred in rendering these services were reasonable." *In re Wolverine*, 2012 WL 3930360, at *6.

Determining which defenses to press with respect to claims that are brought are complicated decisions of litigation strategy. The Trustee in bankruptcy must exercise "care, diligence, and skill in deciding which claims to prosecute, and how far." *See In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995). In exercising these duties and in endeavoring to maximize the value of the estate, the Trustee may have a duty "to abandon [a theory or defense] once it became reasonably obvious that further litigation would cost more than it was likely to bring into the estate." *Id.* But a Trustee is not required to abandon a defense while it is still viable. The Trustee's decision to assert that there was no meeting of the minds sufficient to make the employment agreement binding was an appropriate defense at the time. Having acquired intimate knowledge of the litigation, I have no difficulty concluding that the Trustee operated within the bounds of her duty in pursuing a litigation position in the face of a vigorously asserted theory. *See id.* When it became clear that this defense was unlikely to succeed, and a reasonable lawyer would have abandoned it, the Trustee properly did so.

Mr. Crawford places curious emphasis on the fact that this abandonment ultimately came "on the eve of the 2009 Trial," but

this is precisely when Mr. Crawford abandoned the theory that had made the defense worth pursuing. The parties appear to have been locked in a standoff, with Mr. Crawford asserting a claim for *quantum meruit* and the Trustee defending on the basis that there was no meeting of the minds. Both asserted that their positions were unnecessary if only the other would drop its contention first. The Trustee unsuccessfully moved to dismiss the *quantum meruit* claim, and thereafter reasonably conducted discovery necessary to evaluate and defend the case. After discovery, the Trustee again moved for dismissal or summary judgment, and in his opposition, Mr. Crawford stood fast by his *quantum meruit* claim. The Trustee's discovery and trial preparation on the meeting of the minds defense were reasonable and necessary to defend against the contentions Mr. Crawford asserted, and the Trustee did not have a duty to abandon her defense when Mr. Crawford continued to threaten pursuit of his new theory of recovery. When Mr. Crawford ceased pursuing this theory, the Trustee abided by her duty to abandon the claim and did so at the time a reasonable lawyer in her position would have done so. *See In re Taxman*, 49 F.3d at 315. The bankruptcy court therefore did not err in concluding that the costs incurred in pursuing this defense were necessary and reasonable.

## 5. Expenses Not Reasonably Likely to Benefit the Estate in Light of the Magnitude of the Claim

Mr. Crawford next argues that the bankruptcy court erred by overestimating the value of the benefit to the bankruptcy estate that the Trustee sought in the *Crawford* litigation. The bankruptcy court awarded all fees requested in the *Crawford* litigation, reasoning that "the Trustee was successful in obtaining disallowance of Crawford's proofs of claim in the sum of $3,088,765.65." *In re Wolverine*, 2012 WL 3930360, at *6. Mr. Crawford claims that this overestimates the true value of the Trustee's litigation success and therefore the benefit to the estate. He contends that the Trustee should have known that the estate would not need to pay the vast majority of his claim if he were successful, since a large portion of the claim, as treble damages, constituted a penalty, and even the base unsecured claim would not be fully satisfied under the anticipated pro rata distribution of the estate's assets. Accordingly, Mr. Crawford argues that the effort the Trustee expended and the more than $800,000 in fees she incurred in defending against a purportedly $3 million claim were not proportional to the actual benefit the Trustee was reasonably likely to — and indeed did — achieve in not having to pay the approximately $224,000 of that claim that Mr. Crawford would

have received if he were successful.  This argument misconstrues the legal standard and is wholly without merit, inappropriately seeking to penalize the Trustee for defending against Mr. Crawford's relentless pursuit of a claim well beyond what he could actually receive.

Services rendered in an effort "to conserve as much of [the estate] as possible for creditors" are generally calculated to benefit the estate, in contrast to those services taken to benefit someone other than the estate and its creditors.  *Widett* v. *D'Andria*, 241 F.2d 680, 682 (1st Cir. 1957); *see In re Bank of New Engl. Corp.*, 134 B.R. 450, 470 (Bankr. D. Mass. 1991). The key considerations in the inquiry into whether a service is beneficial to the estate are reasonableness and necessity. Professionals must "exercise reasonable judgment," but they need not "guarantee success."  *In re Ne. Express Reg'l Airlines, Inc.*, 235 B.R. 695, 697-98 (Bankr. D. Me. 1999); *see In re Casco Bay Lines, Inc.*, 25 B.R. 747, 755-56 (B.A.P. 1st Cir. 1982). The benefit to the estate accordingly is not measured solely in monetary gain, assessed through a calculation of the monetary value to the estate of pursuing or defending against a claim as compared to the cost to the estate of doing so, but through a

more holistic consideration of the benefit to the estate.[8] *See*
*In re Casco Bay Lines*, 25 B.R. at 756 ("[T]ime spent upon an
issue which an attorney ultimately loses may be beneficial in
connection with aims of the estate in general."); *see also* 11
U.S.C. § 330(a)(4)(A)(ii)(I).

Mr. Crawford takes issue with the Trustee defending against
the entirety of his $3 million claim, contending that the true
value of the claim was far lower. At best, the estate could
have satisfied only approximately $224,000 of the approximately
$885,500 judgment Mr. Crawford sought.[9] Accordingly, Mr.

---

[8] Judge Barliant of the Bankruptcy Court of the Northern District
of Illinois has explained the shift away from a focus on economy
and toward a focus on necessity following the reenactment of the
Bankruptcy Code in 1978:

> [T]he modern construction of "benefit to the estate"
> that attorneys' services must result in monetary benefit
> to the estate is not an application of the pre-Code
> doctrine of "benefit to the estate"; rather it is a
> judicially created descendant of the very different
> doctrine of "economy" or "conservation of the estate."
> But that doctrine was overruled by section 330 of the
> Code and should not be re-introduced into compensation
> analysis under cover of the 'benefit to the estate'
> rubric. . . . The issue under section 330(a) is whether
> services for which compensation is sought are "necessary
> services."

*In re Lifschultz Fast Freight, Inc.*, 140 B.R. 482, 488 (Bankr.
N.D. Ill. 1992).

[9] Mr. Crawford's claim included a non-penalty dimension of
$885,582.37. The full amount of his claim for $3,088,765.65
included more than $2 million in treble damages, constituting a

Crawford perversely asserts that the more than $800,000 the Trustee expended in defending against his claim was not in proportion to the potential benefit to the estate — presumably a savings of about $224,000.

Mr. Crawford's focus on the ultimate numbers ignores the fact that he himself advanced litigation positions challenging the classifications of his requested relief into a penalty dimension of over $2 million — which would be subordinated and never paid by the bankruptcy estate — and a non-penalty dimension of $885,582.37 — which would be partially satisfied through the pro rata distribution of assets to general unsecured claims - and seeking to ensure full payment of the judgment if

penalty under the meaning of 11 U.S.C. § 726(a)(4). Under 11 U.S.C. § 726(a)(4), a bankruptcy estate must first pay all secured claims, then all unsecured claims, and only if all unsecured claims are satisfied does the estate pay fines, penalties, or multiple damages. In this case, there are more than $13 million in allowed general unsecured claims, but the estate only has slightly more than $3 million to distribute. The Trustee was well aware that the large majority of Mr. Crawford's claim would be subordinated as a penalty and never assessed against the bankruptcy estate. Mr. Crawford also should have been aware, from the earliest stages of this litigation, that no penalty claims would be satisfied. In addition, these numbers made clear that even the non-penalty claim Mr. Crawford advanced, as an unsecured claim, could not be fully satisfied. Where there are insufficient funds to satisfy the entirety of the unsecured claims, they will be satisfied pro rata. *See* 11 U.S.C. § 726(b). Mr. Crawford estimates that even if he were successful, the estate would only owe him $224,050.29, accounting for his estimated 23.5% pro rata satisfaction of the various claims against the estate. *See In re Wolverine*, 2009 WL 3930360, at *1.

he were successful.  Despite the clear classification of
penalties such as treble damages at the bottom of the
satisfaction hierarchy, Mr. Crawford consistently asserted
during the litigation that the entire amount of his claim
constituted a general unsecured claim and that no part of it
would be subject to subordination.  Mr. Crawford finally
acknowledged that the penalty portion of his claim would be
subordinated more than two years into the litigation but
continued to assert the claims on appeal.

Mr. Crawford asserts that the Trustee's knowledge of the
clear state of the law subordinating penalties somehow obligated
her not to pursue an objection to the entirety of the claim or
otherwise pull her punches in defense of the estate.  In these
circumstances, the Trustee had no choice but to defend against
the full amount of the claim Mr. Crawford asserted, including
the penalty portion, and she has maintained since she first
filed objections to Mr. Crawford's claim that the claim for
treble damages constituted a penalty subject to subordination.
To fail to advance this position in defense of the estate, even
where the law is abundantly clear to both the court and to Mr.
Crawford, might be viewed as assent to his claim and a
suggestion that the bankruptcy estate would owe the full amount

of the claim if he were successful.  It would be nonsensical to hold that where a bankruptcy Trustee believes a claim against the estate invalid, she cannot recover fees for pursuing an objection to the claim when she turns out to be correct that the estate owes nothing to the claimant.

In prosecuting his unsuccessful claim, Mr. Crawford fruitlessly sought review to the First Circuit and the U.S. Supreme Court, where his efforts were summarily rejected.  *See supra*, Section I.A.  Furthermore, after the sunk costs of litigation at the trial level, the Trustee had an obligation to pursue the case to its completion; the marginal increase in fees incurred defending the appeals could not have justified conceding the claims (appealed in the full amount of over $3 million) that she had spent more than six years and hundreds of thousands of dollars defending.

In short, the Trustee objected to and defended against Mr. Crawford's claims on terms set by Mr. Crawford himself.  The litigation was "hotly contested, factually complicated," and the subject of lengthy discovery, dispositive motion practice, two trials, post-trial motions, and appeals.  *See In re Wolverine,* 2012 WL 3930360, at *6.  Since Mr. Crawford pressed the courts to award him the full amount of over $3 million, including on

his numerous appeals, the Trustee's defense against those claims at each of these stages of the litigation was reasonable and necessary, even where the monetary benefit to the estate of succeeding in this litigation may not have exceeded the ultimate costs of pursuing it. The bankruptcy court properly considered the full value of the claim asserted in the *Crawford* litigation in awarding the Trustee's requested fees. Having zealously forced the Trustee to engage with his claim and then having failed to prevail, Mr. Crawford cannot complain that the Trustee should have simply stopped defending the estate because his claims were so clearly unsuccessful from the beginning. The bankruptcy court did not err in considering Mr. Crawford's claim to be valued at over $3 million for these purposes and in determining that the efforts of the Trustee and her professionals in defending against this claim were reasonably likely to benefit the estate.

### 6. Unnecessary Duplication of Services

Mr. Crawford contends that the Trustee brought too many resources to bear against him, and that this should be grounds for reducing the award of fees. He argues that because various experts and attorneys attended the 2008 and 2009 trial, the Trustee engaged in unnecessary duplication of efforts. *See* 11

U.S.C. § 330(a)(4)(A)(i); *see also In re ACT Mfg., Inc.*, 281 B.R. 468, 484 (Bankr. D. Mass. 2002). However, Mr. Crawford does not contend that the bankruptcy court failed to consider the possibility of duplication of effort. Indeed, he cannot. The bankruptcy court specifically acknowledged that it must "disallow compensation for unnecessary duplication of services," and specifically mentioned Mr. Crawford's objection that "there was inefficient duplication of effort between the Trustee's attorneys." *In re Wolverine*, 2012 WL 3930360, at *3, *5.

Mr. Crawford has offered no explanation — other than asserting that he disagrees — or authority to support a finding that the bankruptcy court may have abused its discretion in awarding the full amount of requested fees in the *Crawford* litigation. He merely complains of "the enormous resources brought to bear against a solitary pro se litigant," apparently underestimating the level of havoc he has wreaked on the orderly resolution of this bankruptcy. The *Crawford* litigation covered many issues and spanned many years and multiple dockets. It was certainly reasonable for the Trustee to have counsel and experts in attendance at the trial in order to be apprised of any and all significant developments that might bear on the rest of the litigation. As for the extent of the attendance and billing,

the Trustee offered the bankruptcy court evidence of admirable billing discretion, often having counsel attend the trials without billing their time.  Having presided over the litigation myself, I cannot find that the bankruptcy court abused its discretion in awarding full fees.

### 7.  Consideration of Improper Factors

Finally, Mr. Crawford identifies two components of the bankruptcy court's decision that he contends were improper considerations in the fee calculation.  Both claims of error are without merit.

First, remarkably, Mr. Crawford blames the Trustee for the mistrial in 2008 and asserts that the bankruptcy court failed to credit this view.  Neither party is responsible for the mistrial.  Two jurors — who were instructed not to engage in any independent research but nevertheless did — caused the mistrial.  Mr. Crawford blames the Trustee's expert as somehow prompting independent research, but no argument or evidence presented at trial justifies or excuses a juror disregarding the court's instructions not to undertake such an exercise.  A party is entitled to put on the evidence she chooses, and the court cannot fault any party for a juror's independent and contumacious conduct even if it was somehow related to the

evidence presented.  To hold otherwise would be to chill a
party's right to put on her case, no matter how technical or
complex, based upon apprehensions of juror misconduct.  The
bankruptcy court properly held that the 2008 mistrial was "no
fault of the Trustee or her professionals," and properly refused
to discount fees incurred as a result of jury or misconduct.  *In
re Wolverine*, 2012 WL 3930360, at *6.

Second, Mr. Crawford suggests that the bankruptcy court
erred by considering the size of the claim he purchased to
maintain his objections and his motivation in pursuing these
objections in determining the reasonableness of the Trustee's
requested fees.  The bankruptcy court did not rely on any
improper factors when it stated that "[t]he Court agrees with
the Trustee that Crawford's objection to the professionals' fee
Applications is improperly motivated by his refusal to accept
the final disallowance of his claim."  *Id.* at *6.

The basis for Mr. Crawford's status as an objector to the
fee applications merits acknowledgment.  Mr. Crawford originally
brought a claim seeking more than $3 million.  Having exhausted
his appeals and lost both his case and any chance of recovery,
Mr. Crawford purchased a new claim for an insignificant sum
relative to his original claim - $60.52 as compared to

$3,088,765.55 – purely for the purpose of gaining standing to oppose the Trustee and her professionals' request for fees. *See id.* at *1 & n.1. Mr. Crawford knew, before he purchased this claim, that he was guaranteed to lose money, even if he proved successful at reducing or eliminating the fees requested, because the bankruptcy estate does not have sufficient funds to satisfy the entirety of the general unsecured claims. I therefore agree that Mr. Crawford's fee objections are motivated by a retaliatory purpose and reflect his characteristic lack of proportion in approaching this litigation. Strictly speaking, Mr. Crawford's improper and vindictive motivation is ultimately not material to evaluation of the reasonableness of the fees requested. The bankruptcy court opinion does not indicate that it considered the size of Mr. Crawford's claim or his improper motive in determining the reasonableness of the fees. Nevertheless, these factors provide a context for understanding Mr. Crawford's otherwise incomprehensible arguments and his disregard of the collateral estoppel bar to much of his challenge to the fees sought by an adversary who successfully prevailed against him.

8.  Underline

The bankruptcy court properly considered whether the requested fees and expenses satisfied the requirements of 11 U.S.C. §§ 326 and 330 and did not place weight on any improper factors in doing so.  Accordingly, I will affirm its determination of the appropriate fees and costs in the *Crawford* litigation, except to the extent that the deposition transcript costs, which I have previously determined not to be necessary, shall be ordered excluded from the award.

## C.  Tencara *Litigation Fees*

The Trustee and her professionals cross appeal the bankruptcy court's reduction of their requested fees relating to the *Tencara* litigation, in which the Trustee unsuccessfully attempted to recharacterize the Tencara loan as equity rather than debt, or alternatively equitably to subordinate it to the claims of all other creditors.  They allege that the bankruptcy court made three errors: (1) it failed to evaluate the likelihood of success appropriately, (2) it failed to balance the potential benefit of the litigation against the incremental costs of continuing the litigation properly, and (3) it improperly engaged in hindsight analysis by considering the ultimate result obtained in the litigation.  Although all three

of these claims of error at their core stem from the a common
source — the bankruptcy court's assessment of whether pursuing
the *Tencara* litigation was reasonably likely to benefit the
estate, as required for compensation under 11 U.S.C. § 330 — I
will separately evaluate each in turn.

    1.  Likelihood of Success

    The Trustee and her professionals assert that the
bankruptcy court's holding that it "should have become clear
. . . after the close of discovery . . . that they were unlikely
to be able to succeed on any of the counts . . ." in the *Tencara*
litigation, *In re Wolverine*, 2012 WL 3930360, at *7, is clearly
erroneous for both the recharacterization and equitable
subordination claims in light of the record and the Trustee's
initial success on her dispositive motions.

    Likelihood of success is a consideration that speaks to the
necessity of the service and whether it is "reasonably likely to
benefit the estate." *See* 11 U.S.C. §§ 330(a)(3)(C),
330(a)(4)(A)(ii)(I).  As noted above, Trustees and their counsel
must exercise reasonable judgment "in deciding which claims to
prosecute, and how far." *In re Taxman*, 49 F.3d at 315; *see In
re Ne. Express*, 235 B.R. at 697-98.  When a reasonable lawyer
"would have abandoned the lawsuit" because "it became reasonably

obvious that further litigation would cost more than it was

likely to bring into the estate,"[10] a professional may be

penalized by a fee reduction for not abandoning that litigation.

*In re Taxman*, 49 F.3d at 315; *see In re McLean Wine Co.*, 463

B.R. 838, 850-51 (Bankr. E.D. Mich. 2011) (discussing *In re*

*Taxman* and noting that "counsel for the trustee has a fiduciary

duty to realistically weigh the maximum possible success of any

litigation against the costs to be incurred pursuing the

litigation").  This is an objective assessment made from the

standpoint of the time at which the services are rendered.  *See*

*In re Taxman*, 49 F.3d at 315; *McLean*, 463 B.R. at 851; *see also*

11 U.S.C. §§ 330(a)(3)(C), 330(a)(4)(A)(ii)(I).

        *a. Recharacterization*

    A bankruptcy court may recharacterize debt as equity where

"a creditor has contributed capital to a debtor in the form of a

loan, but the loan has the substance and character of an equity

contribution."  *Aquino* v. *Black (In re AtlanticRancher, Inc.)*,

279 B.R. 411, 433 (Bankr. D. Mass. 2002) (quoting *In re Kids*

*Creek Partners*, 212 B.R. 898, 931 (Bankr. N.D. Ill. 1997)).  As

---

[10] It bears noting the distinction between defending the estate,
where pursuit of the litigation initiative is ultimately in the
hands of an opponent, as in the *Crawford* litigation, and
deciding when and how to prosecute a claim which is ultimately
in the hands of the Trustee.  That distinction justifies
different approaches in evaluating the reasonableness of the
Trustee's exercise of judgment.

the Trustee and the bankruptcy court both recognized, there is something of a circuit split regarding the appropriate test for when to permit recharacterization,[11] and there is no controlling precedent in the First Circuit.[12] *See Tencara*, 447 B.R. at 24, 37 (quoting *In re AtlanticRancher*, 279 B.R. 411).

Some courts follow the lead of a 1986 Eleventh Circuit case, *Estes* v. *N&D Properties, Inc. (In re N&D Properties, Inc.)*, 799 F.2d 726 (11th Cir. 1986), and employ a two-part test for recharacterization. *See In re First NLC Fin. Servs., LLC*, 415 B.R. 874, 879-80 (Bankr. S.D. Fla. 2009). In *In re N&D Properties,* the court stated that "[s]hareholder loans may be deemed capital contributions . . . [1] where the trustee proves initial under-capitalization <u>or</u> [2] where the trustee proves that the loans were made when no other disinterested lender

---

[11] There is also somewhat of a circuit split over the power of a bankruptcy court to recharacterize debt in the first instance. However, most circuits now agree that "the bankruptcy court has the inherent authority to properly characterize a purported claim as debt or equity." *Riley* v. *Tencara (In re Wolverine, Proctor & Schwartz, LLC) ("Tencara")*, 447 B.R. 1, 24 (Bankr. D. Mass. 2011); *see In re First NLC Fin. Servs., LLC*, 415 B.R. 874, 878-79 (Bankr. S.D. Fla. 2009) (noting that the Third, Fourth, Sixth, Tenth, and Eleventh Circuits "recognize the power of bankruptcy courts to recharacterize debt as equity").
[12] Despite advancing this position in their opening brief, the Trustee and her professionals distance themselves in their reply brief from the idea that two distinct lines of case law can be discerned. The cases cited in their opening brief support the circuit split the Trustee initially recognized, however.

would have extended credit." *N&D Props.*, 799 F.2d at 733 (citation omitted; emphasis added).

More recent circuit court decisions have employed a multi-factor test to determine if recharacterization is appropriate. *See, e.g., Cohen* v. *KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 455-56 (3d Cir. 2006); *Fairchild Dornier GMBH* v. *Official Comm. of Unsecured Creditors (In re Official Comm. of Unsecured Creditors of Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006); *Sender* v. *Bronze Group, Ltd. (In re Hedged-Invs. Assocs., Inc.)*, 380 F.3d 1292, 1298-99 (10th Cir. 2004); *Bayer Corp.* v. *Masco Tech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 749-50 (6th Cir. 2001); *see also In re First NLC*, 415 B.R. at 880 (collecting cases). These factors, which are to be considered in the aggregate and in the context of the specific facts of a given case, typically include the adequacy of capital contributions, the ratio of shareholder loans to capital, the amount or degree of shareholder control, the availability of similar loans from outside lenders, and other relevant considerations. *See, e.g.*, *Blasbalg* v. *Tarro (In re Hyperion Enters., Inc.)*, 158 B.R. 555, 561-62 (D.R.I. 1993).

The Eleventh Circuit two-part test is more favorable to the Trustee because she would need to prove only initial undercapitalization. *See In re N&D Props.*, 799 F.2d at 733; *cf. In re AtlanticRancher*, 279 B.R. at 434-35 ("[I]f this Court were to rely upon the two *N&D Properties* factors alone, the Trustee would prevail on his recharacterization count."). Under a multi-factor test, however, the Trustee bears the burden of satisfying several factors, including undercapitalization, and demonstrating that "the transaction [was] not a loan at all," *In re Dornier Aviation*, 453 F.3d at 234, but was rather "intended . . . as something else."[13] *In re AutoStyle*, 432 F.3d at 455-56.

The presiding bankruptcy judge here had addressed this circuit split in a 2002 case, *In re AtlanticRancher*, 279 B.R. at 433-34, and adopted the multi-factor approach. *See Tencara*, 447 B.R. at 24, 29.[14] Given the presiding judge's prior articulation

---

[13] In their original brief on appeal, the Trustee and her professionals appear to concede that they could not have satisfied a multi-factor test for recapitalization, emphasizing instead that they "could not have predicted" that the bankruptcy court would decline to follow the *N&D Properties* test. Yet in their reply brief, the Trustee and her professionals contend that they were confident after motion practice that they would prevail under a multi-factor analysis as well, citing a variety of facts they contend they were able to prove.

[14] In *In re AtlanticRancher*, the bankruptcy judge acknowledged the multi-factor test articulated by the Sixth Circuit in *In re AutoStyle*. *In re AtlanticRancher*, 279 B.R. at 431-32. She ultimately employed a shorter list of factors set forth in a District of Rhode Island case, *Blasbalg* v. *Tarro (In re Hyperion*

of her position, the Trustee and her professionals no doubt
discovered early in their research that they would have an
uphill battle attempting to persuade the judge either (1) to
adopt the two-part *In re N&D Properties* test over the hybrid
multi-factor test the court had already adopted in *In re*
*AtlanticRancher*;(2) to recharacterize the debt on a showing of
undercapitalization and non-statutory insider status alone, a
position which the judge's opinion in *In re AtlanticRancher*
suggested she would reject and which has been rejected
explicitly by other courts; or (3) to conclude that the multi-
factor test weighed in favor of recharacterization. *See In re*
*AtlanticRancher*, 279 B.R. at 434 (recognizing that the *In re*
*Hyperion* court, whose multi-factorial test she adopted, had
"specifically rejected the notion that undercapitalization alone
justifies recharacterization of debt to equity") (citing *In re*
*Hyperion*, 158 B.R. at 561)); *see also In re Dornier Aviation*,
453 F.3d at 234 ("a claimant's insider status and a debtor's
undercapitalization alone will normally be insufficient to
support the recharacterization of a claim.").

---

*Enters., Inc.)*, 158 B.R. 555, 561 (D.R.I. 1993), and explicitly
rejected the view that undercapitalization alone would be
sufficient to justify recharacterization. *See In re*
*AtlanticRancher*, 279 B.R. at 434 (citing *In re Hyperion*, 158
B.R. at 561). The suggestion by the Trustee that *In re*
*AtlanticRancher* "followed and expanded upon *N&D Properties*" is
an inaccurate characterization of that opinion.

In her memorandum following the *Tencara* trial, the presiding bankruptcy judge not surprisingly relied on her *AtlanticRancher* decision and concluded that the multi-factor tests employed more recently in the Fourth and Third Circuits were "more compelling than the test set forth in *N&D Properties*" because they "permit a more thorough evaluation of the substance of the challenged loan and the parties intent." *Tencara*, 447 B.R. at 24, 29, 30.[15] Utilizing this multi-factor approach, the bankruptcy court concluded that the Trustee had demonstrated undercapitalization but that there was no "indicia of control exerted by Tencara in the affairs of the Debtor" and instead that there was support for "Callan's testimony that Tencara made the $1.9 million loan to the Debtor based on an assessment of collateral values, as well as cash flow." *Tencara*, 447 B.R. at 38-39. Accordingly, the court concluded "that the $1.9 million advanced by Tencara to the Debtor was a loan," because "[t]he only direct evidence of the parties' intent was the unequivocal testimony of Callan and Kulkarni that . . . [the] advance was intended to be a loan," and the inferences from the other available evidence did not warrant a different conclusion. *Id.*

---

[15] The judge also predicted "that the First Circuit would follow [the recent decisions from the Fourth and Third Circuits] in utilizing factors culled from tax cases." *Tencara*, 447 B.R. at 29.

at 40. The court recognized, however, that "some factors, such as undercapitalization, Tencara's subordination of its debt to that of CapSource, and the Debtor's use of the funds to satisfy existing debt rather than to acquire capital assets, as well as Tencara's payment of payroll and CapSource in the sum of $295,000, might suggest that the advance was equity." *Id.* However, "the majority of factors, most particularly the intent of the parties, weigh heavily in favor of characterization of the advance as a loan." *Id.* at 40-41.

With this context, I reach the claimed error. When the Trustee and her professionals sought an award of fees for pursuing the *Tencara* litigation, the bankruptcy court reduced the fees because it concluded that the Trustee and her professionals "did not objectively and impartially evaluate the merits or the risk of loss to the estate in the Tencara Litigation before the trial," and "[t]he attorneys did not adequately analyze the weaknesses of the Trustee's case against Tencara in light of the magnitude of its secured claim." *In re Wolverine*, 2012 WL 3930360, at *6. The court determined that the Trustee and her professionals were not at fault "for investigating the validity of Tencara's secured claim, commencing the action, and conducting discovery," but that "it

should have become clear to the Trustee's co-counsel after the close of discovery, during the trial preparation phase of the case . . . that they were unlikely to be able to succeed on any of the counts." *Id.* at *7. In other words, the court reduced the fees because it concluded that the Trustee and her professionals should have known that they could not prove the facts necessary to justify recharacterization under a multi-factor assessment.

The Trustee and her professionals protest that their initial victories defending against Tencara's motions to dismiss and for summary judgment afforded them the reasonable belief that they might succeed at trial. This overstates the bankruptcy court's pre-trial rulings. The bankruptcy court denied Tencara's motions to dismiss and for summary judgment because the Trustee's pleadings and the evidence *read in the light most favorable to the Trustee* were sufficient to raise genuine issues of material fact regarding recharacterization.[16]

---

[16] In denying Tencara's motion for summary judgment, the bankruptcy court recognized the application of the multi-factor tests to the recapitalization issue and found "that the record shows that there are numerous genuine issues of material fact which preclude entry of judgment in favor of Tencara," including "whether the friendship and business relationship between Mr. Kulkarni and Mr. Callan subjects the so-called '2005 Transaction' to a heightened level of scrutiny; 2) whether the Debtor's capital structure was such that a prudent lender would not have made a similar loan to the Debtor in 2005; 3) whether

Success on a motion to dismiss or for summary judgment is not an indication of the quality of a party's factual case; it is merely a determination that the issues must be put to a finder of fact.

Here, however, where the governing legal standard involves a "highly fact-dependent" multi-factorial inquiry, a reasonable lawyer could, at least in theory, believe that there was some merit to her case when the judge – who is to serve as the fact-finder at a bench trial – identified several outstanding factual issues that precluded judgment as a matter of law. *See In re Dornier Aviation*, 453 F.3d at 234. Indeed, it is apparent from the court's ultimate ruling in the case that some – and not merely one – of the factors were satisfied. *See Tencara*, 447 B.R. at 40.

But the standard is not whether there was a chance of success; the question is whether at some point "it became

the debtor was undercapitalized during all relevant periods and, if so, whether undercapitalization caused the failure of the Debtor; 4) whether the 2005 Transaction was an arm's length transaction; 5) whether Tencara exerted any influence or control over the Debtor, and, if so, the extent of such influence or control; 6) whether and to what extent Tencara performed diligence in making the decision to advance money to the Debtor; and 7) whether the economic reality of the circumstances of the 2005 Transaction and the parties' intent warrant treatment of the 2005 Transaction as an equity investment as opposed to a debt." *Tencara*, No. 07-01179 (Bankr. D. Mass.) (Order, May 22, 2009, Dkt. Doc. 101).

reasonably obvious that further litigation would cost more than it was likely to bring into the estate." *In re Taxman*, 49 F.3d at 315. The bankruptcy court's reasoning in reducing the fees suggests it was Mr. Kulkarni's testimony that was likely to be, and ultimately was, fatal to the Trustee's case. *See In re Wolverine*, 2012 WL 3930360, at *7 (noting that the Trustee and her professionals lacked the evidentiary basis to succeed, "particularly in the absence of compelling testimony from Mr. Kulkarni whom the Trustee relied upon as a key witness," and "whose testimony and credibility had the potential to either support or undermine the Trustee's claims for relief"). The bankruptcy court implicitly reasoned that a reasonable lawyer would have determined after conducting Kulkarni's deposition that he was unlikely to provide the testimony needed to tip the multi-factorial assessment in the Trustee's favor. A reasonable lawyer, by the bankruptcy court's assessment, should have known at the close of discovery — in light of the limitations of Mr. Kulkarni's testimony — that the evidence itself was far from sufficient to substantiate the account of the facts the Trustee sought to pursue. That reasonable lawyer would have considered this weakness in relation to the "costs that the estate would be obligated to pay in the event the action against Tencara was

unsuccessful," *In re Wolverine*, 2012 WL 3930360, at *6, and would have decided to abandon course to save the bankruptcy estate further expense.

The bankruptcy court reached these conclusions regarding how far a reasonable lawyer would go in pursuing this claim on these facts by viewing them through the lens of the legal standard the presiding judge had herself selected and applied in this case – that is, the presiding judge's articulation of the multi-factor test. From the different perspective that a judge in a review function can provide — where the legal standard, its precise contours, and the framework for its application have not been clearly defined in this circuit — a reasonable lawyer receiving an adverse decision under the multi-factor test and believing that she had a meritorious claim might have considered the pursuit of an appeal challenging the bankruptcy court's articulation of the multi-factor test and its application to the facts as a reasonable next step.

Even if I were to conclude that the bankruptcy court erred, however, this would not result in a more favorable outcome for the Trustee under my own reading of the case. The Trustee did not go as far as she could have in pursuing her remedies for demonstrating the reasonableness of her conduct of the *Tencara*

litigation.  After receiving an adverse decision, the Trustee
chose not to appeal the court's articulation of the multi-factor
test and application of it to the facts.  The Trustee knew that
the presiding judge held a particular view on the scope of the
test that was not favorable to her case, but she also should
have known that I, as the judge who would address an appeal in
the first instance, the First Circuit or ultimately the Supreme
Court facing the established circuit split, could take a
different approach on de novo review.  The Trustee voted with
her boots when she abandoned her claim without appeal.  Having
made that decision, presumably on a cost/benefit analysis, she
cannot now argue that the claim had a greater likelihood of
success than the bankruptcy court attributed to it.  This may in
theory be a circumstance "[w]hen abandonment is not the
obviously right course [or] when reasonable professionals could
differ over the right course."  *In re Taxman*, 49 F.3d at 315.
In such circumstances, "the professional is not to be penalized,
just as a trustee is not to be surcharged for a discretionary
judgment that later proves to have been mistaken."  *Id*.

But hypothetical differences are not sufficient to warrant
displacement of the bankruptcy judge's actual ruling under the
highly deferential standard that applies to my review on this

appeal.  *See In re DN Assocs.*, 3 F.3d at 515.  I cannot say that

the bankruptcy court committed clear error in assessing the

likelihood of success using its own understanding of the

applicable legal standard, where another articulation of the

test has not been adopted in this circuit.  As a result, I will

not disturb the bankruptcy court's award on this basis.[17]

>     *b. Equitable Subordination*

Similar to recharacterization, equitable subordination

"permits a bankruptcy court to rearrange the priorities of

creditors' interests."  *See Capitol Bank & Trust Co.* v. *604*

*Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty*

*Trust)*, 968 F.2d 1332, 1353 (1st Cir. 1992).  Equitable

subordination is authorized by 11 U.S.C. § 510(c) and similarly

requires a fact-intensive analysis.  A court may equitably

subordinate a claim if (1) the claimant engaged in inequitable

conduct, (2) the misconduct resulted in injury to creditors or

some unfair advantage for the claimant, and (3) equitable

subordination would not be inconsistent with the Bankruptcy

Code.  *See In re 604 Columbus Ave.*, 968 F.2d at 1353; *see also*

11 U.S.C. § 510(c).  Undercapitalization and insider status are

not sufficient for equitable subordination; instead, there must

---

[17] Given the disposition of the issue on the basis of the multi-factor test, it is unnecessary to reach the question of insider status, and I decline to do so.

be some separate identifiable "inequitable conduct." *In re 604 Columbus Ave.*, 968 F.2d at 1353.

The Trustee nevertheless apparently believed that undercapitalization would be highly relevant, if not determinative, with respect to equitable subordination, as she did with her recapitalization claim. The Trustee points to the bankruptcy court's finding that Mr. Kulkarni "shamelessly used his positions . . . to advance his personal financial interests . . ." to demonstrate some inequitable conduct. *Tencara*, 447 B.R. at 42. But the bankruptcy court went on to indicate that "the Court does not find that Callan and Kulkarni engineered the 2005 transaction . . . with the intention of benefitting Kulkarni personally." *Id*. Indeed, the existing private equity owners of the company concluded that "the most viable option for the business was to transact it back to Deepak Kulkarni."

Just as with the recapitalization claim, the evidence available at the close of discovery apparently made it clear to the bankruptcy court that the Trustee faced disabling difficulty establishing the inequitable conduct necessary to justify equitable subordination under First Circuit precedent. When paired with the accruing interest costs, this low likelihood of success, by the bankruptcy court's assessment, would have led a

reasonable lawyer to believe that continuing to challenge the validity of the Tencara claim against the estate would no longer provide a benefit to the estate. The court did not commit clear error in so concluding.[18]

## 2. Incremental Costs

The bankruptcy court's determination that a reasonable lawyer would not have pursued the case past discovery is based on two implicit conclusions: first, that the Trustee was unlikely to succeed, as discussed above, and second, that the costs of continuing to pursue the anticipatedly unsuccessful litigation outweighed the potential benefit to the estate from a financial perspective. The Trustee contends that the bankruptcy court erred not only in its first conclusion but also in its incremental cost assessment. As discussed above, the bankruptcy court held that it "cannot fault the Trustee and her professionals for investigating the validity of Tencara's secured claim, commencing the action, and conducting discovery," but that "it should have become clear . . . after the close of discovery . . . that they were unlikely to succeed." *In re*

---

[18] Even if it did, as with the recharacterization claim above, it would be immaterial. The Trustee abandoned her claim upon receipt of the bankruptcy court's *Tencara* decision by choosing not to appeal it; this suggests that she herself believed she was unlikely to succeed. She cannot now argue that her claim had a greater likelihood of success than the bankruptcy court attributed to it, or that her decision not to appeal suggests.

*Wolverine*, 2012 WL 3930360, at *7. The bankruptcy court accordingly reduced the fees requested by the Trustee's co-counsel for the *Tencara* litigation by fifty percent. *Id.* Although the opinion does not explain how the court identified fifty percent as the appropriate reduction, the Trustee observes that "[a] reasonable estimate would be that one-half of the total litigation fees would be incurred for trial," and that the bankruptcy court must have based the reduction amount on this estimate.

The Trustee essentially contends that the bankruptcy court did not adequately consider the amounts at stake and the costs that would be incurred in further pursuing the litigation when it determined that the costs outweighed the potential benefits. However, the Trustee's alternative calculation of the costs and benefits of proceeding with the litigation identifies April 1, 2010, as the determinative date. This is when, by her own report, "[t]he Trustee's Professionals began preparing for trial in earnest." This is the wrong date on which to base the analysis. The bankruptcy court held that the Trustee should have known she was unlikely to succeed at the close of discovery, which occurred in December 2008[19] — this is the time

---

[19] Fact discovery closed in November 2008, and expert discovery closed in December 2008. Tencara filed its motion for summary

frame from which the costs and benefits must be calculated.[20]

The Trustee suggests an ambiguity in the bankruptcy court's decision in this regard, however. The court stated that the Trustee's co-counsel should have known "after the close of discovery, during the trial preparation phase of the case," that the case would be unsuccessful. *In re Wolverine*, 2012 WL 3930360, at *7. To be sure, the close of discovery and the beginning of trial preparation are not necessarily coincident. Nonetheless, as a general principle, once discovery is closed and summary judgment motions are filed, the parties presumably know their own hand and a good deal about the hand held by their opponents, and can meaningfully assess the strength of the case they can present. Accordingly, I conclude that it is immaterial whether the bankruptcy court calculated the reduction from the close of discovery or from the time at which the Trustee and her professionals actually began to prepare for trial.

The cost-benefit analysis is essentially the same regardless of the date on which the court bases the analysis. The Trustee sought to disallow the principal of the Tencara loan at approximately $1.9 million. *See Tencara*, 447 B.R. at 5. The

judgment on January 9, 2009, and the court denied the motion on May 22 of that year.
[20] Mr. Crawford also does not provide an analysis based on any date in late 2008; instead, he offers analyses based on the ends of the fee periods on July 1, 2008 and April 1, 2009.

default rate of interest on this loan amounted to $19,000 per month. For every month the Trustee proceeded with the litigation, the potential judgment increased by $19,000. As of January 1, 2009, the loan had already accrued $608,000 in interest.[21] By January 2011, the date the bankruptcy court issued its decision in the adversary *Tencara* proceeding, the loan would accrue another $456,000 for a total of over $1 million in interest alone. Tencara's litigation costs over this period also rose from less than $300,000 at the close of discovery to more than $1 million by the end of the litigation.

Mr. Crawford, in furtherance of his objection to awarding fees for the *Tencara* litigation, uses an expected value calculation (the accuracy of which the Trustee does not contest) to determine the threshold probability of success above which it would make economic sense to pursue the litigation based on the cost of abandoning the litigation at the close of discovery, the benefit in the event the Trustee wins, and the cost in the event the Trustee loses. At the close of discovery, this percentage is somewhere between 33.7% and 46.5%; surely it did not increase at any later point in the litigation. Based on the bankruptcy court's determination that the Trustee should have known she was

---

[21] This is calculated from April 1, 2006, the date of the petition.

unlikely to prevail, as discussed above, it is reasonable to conclude that the Trustee's probability of success was lower than this threshold.  I cannot say that the bankruptcy court made a clear error in determining that pursuing the litigation would not be reasonably likely to benefit the estate financially, where interest and litigation costs continued to accrue each month the case was pending.  *See In re Wolverine*, 2012 WL 3930360, at *6-7.  Moreover, the Trustee's own decision not to pursue an appeal suggests that she did make a financial determination that the case was not worth pursuing further, just after the point at which the bankruptcy court, in exercising its own judgment, determined that a reasonable lawyer would have done so.

Although the parties discuss the effect of settlement negotiations, the issue of settlement has no relevance in this analysis.  The Trustee and Tencara negotiated based on the amount at stake and their perceived chances of prevailing on their respective positions.  When the parties were unable to reach settlement, the Trustee faced the decision whether to abandon the litigation or press on.  *See In re Taxman*, 49 F.3d at 315.  Even if I were to assume that Tencara's settlement positions were entirely unreasonable, the Trustee and her co-

counsel would not be absolved of their duty to choose the path reasonably likely to benefit the estate.  *See id*.

Accordingly, because the cost-benefit analysis of pursuing the litigation after the close of discovery seems to indicate that the Trustee should not have pursued the case, I find no clear error in the bankruptcy court's finding consistent with this analysis.

### 3.  Consideration of the Results Obtained

Finally, the Trustee and her professionals argue that the bankruptcy court impermissibly engaged in hindsight analysis by considering the results of the *Tencara* litigation in reducing its award of fees.  *See In re Wolverine*, 2012 WL 3930360, at *7 (concluding that "a reduction in compensation . . . is required in view of the results obtained").

There is a split in authority over the question whether a court may deny or reduce fees when the services do not result in a material benefit to the estate.  Section 330, on its face, focuses the compensation inquiry on the time at which the services were rendered, rather than when the result is realized. *See* 11 U.S.C. § 330(a)(3)(C) (court shall consider "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the

completion of, a case"); *id.* § 330(4)(A)(ii)(I) (court shall not allow compensation for services not "reasonably likely to benefit the debtor's estate").

Since the Bankruptcy Code's reenactment in 1978, courts have relied on a lodestar analysis to assess reasonableness under § 330(a). *See In re Lopez*, 405 B.R. 24, 30-31 (B.A.P. 1st Cir. 2009). In so doing, many courts consider reasonableness factors articulated in cases involving fee-shifting in addition to those factors specifically enumerated in § 330(a). *See, e.g., In re UNR Indus., Inc.*, 986 F.2d 207, 208-10 (7th Cir. 1993). Among these factors is "the results obtained," which finds its origin in a twelve-factor test for the award of attorneys' fees that preceded the widespread adoption of the lodestar approach.[22] *See Johnson* v. *Ga. Highway Express, Inc.*, 488 F.3d 714, 717-19 (5th Cir. 1974) (listing twelve commonly employed factors for calculating a fee award), abrogated in part by *Blanchard* v. *Bergeron*, 489 U.S. 87 (1989); *see also Blanchard*, 489 U.S. at 91-95 (noting that following *Hensley* v. *Eckerhart*, 461 U.S. 424 (1983), the lodestar approach became the primary method for determining fee awards); *Blum* v. *Stenson*, 465

---

[22] The *Johnson* factors, including the "results obtained" consideration, have since been integrated into the lodestar calculation. *See Pennsylvania* v. *Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564-65 (1986) (discussing *Blum* v. *Stenson*, 465 U.S. 886, 898-900 (1984)).

U.S. 886, 898-900 (1984) ("results obtained" factor is fully encapsulated in lodestar amount and cannot serve as independent basis for increasing fee award); *Hensley*, 461 U.S. at 434 n.9 (noting that many *Johnson* factors "are subsumed within" lodestar calculation). As a result, in employing the lodestar approach to calculating a fee award under § 330(a), some courts consider the results obtained, despite its apparent contradiction of the emphasis in § 330(a) on the reasonableness at the time the services were rendered. *See, e.g.*, *Andrews & Kurth L.L.P.* v. *Family Snacks, Inc. (In re Pro-Snax Distribs., Inc.)*, 157 F.3d 414 (5th Cir. 1998) (requiring an "identifiable, tangible, and material benefit to the estate" for a fee award under § 330(a)); *see also* Gregory W. Bachmann, *Note, Professional Fees in Bankruptcy: Tailoring the Johnson Factors to Suit Bankruptcy*, 1 Am. Bankr. Inst. L. Rev. 453, 455-56 (1993).

Other courts, however, take a very different approach. Maintaining that they are giving effect to the congressional intent evidenced by the enumeration of specific factors for consideration in § 330(a), several courts have declined to rely on fee-shifting precedent and lodestar adjustment factors in calculating fees under § 330(a) and have instead emphasized that the reasonableness inquiry looks to the time services were

rendered and does not employ the benefit of hindsight. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996) (section 330 requires courts to consider "what services a reasonable lawyer or legal firm would have performed in the same circumstances" (citing *In re Taxman*, 49 F.3d at 315)), abrogated on other grounds by *Lamie* v. *U.S. Trustee*, 540 U.S. 526 (2004); *Roberts, Sheridan & Kotel, P.C.* v. *Bergen Brunswig Drug Co. (In re Mednet)*, 251 B.R. 103, 108 (B.A.P. 9th Cir. 2000) ("The statute does not require that the services result in a material benefit to the estate in order for the professional to be compensated; the applicant must demonstrate only that the services were 'reasonably likely' to benefit the estate at the time the services were rendered."); *In re Value City Holdings*, 436 B.R. 300, 306 (Bankr. S.D.N.Y. 2010) ("To condition professional fees on . . . outcomes would introduce a risk factor to professional services in bankruptcy that is beyond the scope of section 330.").

The stance within the First Circuit is somewhat unclear on this issue. The courts of this circuit have long employed the lodestar approach for calculating fees in bankruptcy and non-bankruptcy proceedings. *See, e.g.*, *Furtado* v. *Bishop*, 632 F.2d 915, 920 (1st Cir. 1980); *In re Lopez*, 405 B.R. at 30-31. In

1982, a bankruptcy appellate panel of the First Circuit
recognized the tension between the "results obtained" lodestar
consideration and the statutory language of "reasonably likely
to benefit the estate." *See In re Casco Bay Lines*, 25 B.R. at
755-56. The *In re Casco Bay Lines* panel considered how the
*Johnson* factors could be used in determining a reasonable hourly
fee in a bankruptcy case under § 330(a) and noted that the court
should consider "the disallowance of compensation for time spent
litigating issues and claims upon which the party seeking the
fee did not ultimately prevail." *Id.* at 755. However, it also
observed that "success" under the lodestar analysis could not be
directly correlated with "benefit" under § 330; instead, "time
spent upon an issue which an attorney ultimately loses may be
beneficial in connection with the aims of the estate in
general." *Id.* at 756. As a result, the panel cautioned that
the lodestar approach "should be tempered with a view towards
the need for the services at the time they were rendered." *Id.*
A bankruptcy judge in the District of Maine later interpreted
*Casco Bay Lines* to mean that "[i]n the bankruptcy context,
rather than considering 'success' achieved, 'benefit' to the
estate is more appropriately weighed." *In re Saturley*, 131 B.R.
509, 521 n.53 (Bankr. D. Me. 1991).

More recently, another bankruptcy appellate panel, in an opinion authored by the bankruptcy judge whose decision is under review here, indicated that the results obtained is indeed a central consideration in the lodestar calculation and adjustment of a fee award under § 330(a). *See In re Lopez*, 405 B.R. at 30-31. The panel stated that "the degree to which the prevailing party succeeds is a crucial factor in shaping a fee award. Success is evaluated in terms of the number of successful claims, the relief actually achieved, and the societal importance of the vindicated right." *Id.* (internal quotation marks and citations omitted). The First Circuit has also indicated some support for the view that the results obtained is a relevant consideration under § 330(a). In *In re Sullivan*, 674 F.3d at 69, the First Circuit stated that "[t]he section 330 factors mirror those encapsulated in the traditional lodestar approach to calculating attorneys' fees," implicitly recognizing — but not explicitly holding — that considerations such as the results obtained may be relevant in adjusting the lodestar.

Although the First Circuit appears to permit consideration of the result obtained in determining the reasonableness of a requested fee, there is some uncertainty as to the weight the

ultimate result should have,[23] and that this consideration is not

of determinative importance in the § 330 analysis where the

---

[23] First Circuit precedent in the context of attorney fee
awards under the Civil Rights Attorney Fees Award Act, 42 U.S.C.
§ 1988, which permits a fee award for the "prevailing party,"
provides some, albeit limited, guidance on this issue.  The
First Circuit, following signs from the Supreme Court, has
generally considered the results obtained to be a significant
factor in fee calculations but has cautioned against defining
the term too narrowly.

    In *Hensley* v. *Eckerhart*, 461 U.S. 424, 434-36 (1983), the
Supreme Court emphasized that "the most critical factor" both
within and as an adjustment to a lodestar calculation, is the
degree of success obtained, and offered guidance for when a
prevailing party's limited success should lead to a reduction in
the fee award  The Court spoke in terms of degree, rather than
exact calculations, recognizing that in complex civil rights
litigation, "the range of possible success is vast," and [t]here
is no precise rule or formula" for taking the degree of success
into account.  *Id.* at 436; *see Farrar* v. *Hobby*, 506 U.S. 103,
114-15 (1992) (discussing and applying *Hensley* principles).

    The First Circuit, recognizing that results obtained is "a
preeminent consideration in the fee-adjustment process"
involving the lodestar calculation, has explicitly defined the
"results obtained" to encompass, broadly, "a plaintiff's success
claim by claim, . . . the relief actually achieved, . . . [and]
the societal importance of the right which has been vindicated."
*See Coutin* v. *Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331,
338 (1st Cir. 1997).  These measures, in combination,
"potentially bear upon the amount of an ensuing fee award."  *See
id.* at 338-41.

    In *Coutin*, the district court judge had taken into
consideration the "limited success" of the plaintiff – meaning
that she had obtained a far smaller damages award from the jury
than she had sought - in awarding only $5,000 of the $52,000
requested in attorney's fees.  *Id.* at 336, 338.  The First
Circuit, employing its broad definition of results obtained,
reasoned that a judge "can take [a] small judgment into
reasonable account in massaging the lodestar," but "may not
automatically reduce a fee award in proportion to a judgment
that is significantly less than the plaintiff sought."  *Id.* at
340.  Going through each measure of success in turn, the First

statute expressly identifies other key factors.  Nonetheless,
the bankruptcy court here rested its determination that a
"substantial reduction of fees" was warranted on "[t]he result
obtained, namely judgment in favor of the Defendant, and the
complete lack of any benefit to the estate resulting from the
litigation."  *In re Wolverine*, 2012 WL 3930360, at *6; *see id.*
at *7 (emphasizing that the litigation "was unsuccessful" and
"[t]he result was harmful from the perspective of creditors,"
and that "a reduction in compensation . . . is required in view
of the results obtained").  In placing such great weight on the
result obtained, particularly where this factor is of uncertain

---

Circuit concluded that "the more than 90% fee reduction that the
court imposed cannot be justified on the basis of limited
success," because while "the ratio of the damages requested to
the judgment received" was not favorable to the plaintiff, she
had achieved 100% success from a claim-by-claim standpoint, and
the relief afforded was "substantial in absolute terms."  *Id.* at
340-41.  As a result, her "success" as the First Circuit defined
it was not nearly as limited as the district court judge had
considered it to be, and the court vacated the order awarding
fees and remanded for further proceedings.  *See id.* at 342.

     Although *Coutin* and other cases indicate that the results
obtained and the degree of success is a relevant consideration
in calculating and adjusting the lodestar in the "prevailing
party" context, the First Circuit has not directly addressed
whether it carries equal weight under § 330, where the statutory
language provides a specific list of considerations.
Consequently, reliance upon cases from the "prevailing party"
context must be undertaken with considerable caution and
attention to nuance since § 330 does not require a Trustee to be
a "prevailing party" as a necessary condition to fee recovery.

import in the § 330 analysis, the bankruptcy court comes close to "a serious mistake in weighing" the proper factors for consideration under § 330. *See In re Sullivan*, 674 F.3d at 68.

Reversal of a bankruptcy court's fee award on appeal would be appropriate where, after reviewing the record as a whole, I am left with "the irresistible conclusion that a mistake has been made." *United States* v. *One Star Class Sloop Sailboat*, 546 F.3d 26, 35 (1st Cir. 2008) (internal quotation marks omitted). Here, the bankruptcy court appears to have based its decision to reduce the *Tencara* litigation fees in some part on "a mistaken impression of applicable legal principles," *Taylor* v. *Hosseinpour-Esfahani*, 198 B.R. 574, 577 (9th Cir. B.A.P. 1996) (citation omitted), namely that the result obtained constitutes a significant, if not determinative, factor in reducing a lodestar amount.

However, reversal and remand are not appropriate dispositions where, as here, it is also apparent the bankruptcy court would reach the same conclusion using the correct balancing of factors. The bankruptcy court concluded that "it should have become clear to the Trustee's co-counsel after the close of discovery . . . that they were unlikely to be able to succeed on any of the counts," *In re Wolverine*, 2012 WL 3930360,

at *7, a finding that I affirmed above.  The court determined that "both of the law firms employed by the Trustee as her co-counsel did not objectively and impartially evaluate the merits or the risk of loss to the estate in the Tencara Litigation before the trial," *id.* at *6, and that the costs of continuing to pursue the litigation when it became clear that the Trustee was unlikely to prevail outweighed the benefit to the estate of further pursuit.  The language finding that the law firms employed by the Trustee "did not objectively and impartially evaluate the merits" seems unintentionally overstated to the degree it might be read to suggest self dealing by fee churning. The record contains no basis for such a suggestion.  That said, the language conveys the bankruptcy court's finding that pursuit of the Tencara litigation through trial was not a reasonable exercise of judgment.

Ultimately, when "a reasonable lawyer would have abandoned the lawsuit," a professional may be penalized by a fee reduction for not doing so.  *In re Taxman*, 49 F.3d at 315.  Here, the bankruptcy court's decision can be supported by proper factors, namely that the services provided in furthering the *Tencara* litigation after the close of discovery were not reasonably likely to benefit the estate and should be excluded from the fee

award under 11 U.S.C. § 330(a)(4)(A)(ii)(I). That the bankruptcy court may have placed undue emphasis on another consideration – the results obtained – and used overwrought language in doing so does not change this outcome. Accordingly, reversal or modification of the bankruptcy court's judgment is not necessary.

### IV. Belated Assertion of One Dollar Arithmetic Error

Finally, I address Mr. Crawford's motion to correct an arithmetic error in my award of costs to the Trustee in the *Crawford* litigation. On September 14, 2010, I awarded the Trustee costs "in the amount of $2,903.65, resulting from the deletion of the costs claimed for the deposition transcripts of Messrs. Georgiou and Lowey." *See Crawford*, Civ. Action No. 07-10279-DPW (D. Mass.) (Memo. & Order, Sept. 14, 2010, Dkt. No. 182). This awarded amount contains an arithmetic error of one dollar. The full costs requested totaled $3,598.80. After subtracting $278.20 for the transcript of Mr. Lowey and $417.95 for the transcript of Mr. Georgiou, the correct amount of the award should have been $2,902.65.

Mr. Crawford paid the awarded amount of $2,903.65 without objection and did not raise the issue during the more than 18 months between the award and filing his brief on this appeal.

He then filed a Rule 60(a) motion to correct the arithmetic error.[24] *In re Wolverine*, Civ. Action No. 07-10279-DPW (D. Mass) (Rule 60(a) Motion, Apr. 25, 2012, Dkt. No. 190); *see* Fed. R. Civ. P. 60(a); Fed. R. Bankr. P. 9024 (adopting the relevant portions of Rule 60 for bankruptcy proceedings).

Rule 60(a) does not impose a time limit for correcting a clerical mistake.  Under Rule 60(a), "[t]he court may correct a clerical mistake . . . whenever one is found . . . ."  *See Scola* v. *Boat Frances, R., Inc.*, 618 F.2d 147, 152 & n.1 (1st Cir. 1980) ("The concept implied is that Rule 60(a) (which is unlimited in time) deals with mechanical corrections that do not alter the operative significance of the judgment, that could not affect a party's interest in taking an appeal, and that, therefore, can reasonably be made at any time.").  *Contrast* Fed. R. Civ. P. 60(c) ("A motion under Rule 60(b) must be made within a reasonable time" and in some cases "no more than a year after the entry of the judgment or order or the date of the proceeding.").

---

[24] I denied this motion on March 29, 2013, noting that I would offer further explanation of that ruling here. *See In re Wolverine*, Civ. Action No. 07-10279-DPW (D. Mass) (Memo. & Order, March 29, 2013, Dkt. No. 197).  Mr. Crawford appealed the ruling to the First Circuit, which dismissed the appeal for lack of jurisdiction in light of my indication that I would give the ruling further consideration here in connection with the appeal of the bankruptcy court's final fee award. *See In re Wolverine*, No. 13-1554 (Judgment, 1st Cir. June 20, 2014).

However, Rule 60(a) does not _require_ a court to correct a clerical error, and instead vests courts with discretion in deciding whether to do so, through its use of the permissive "may" rather than "shall."  Fed. R. Civ. P. 60(a); _see Diaz_ v. _Jiten Hotel Mgmt., Inc._, 741 F.3d 170, 174-75, 176 (1st Cir. 2013) (district courts have "narrowly circumscribed authority" and are "free to correct such mistakes").  I find and conclude Mr. Crawford effectively waived his right to challenge the one dollar arithmetic error by failing to raise the issue within a reasonable time.  _See Crawford,_ Civ. Action No. 07-10279-DPW (D. Mass.) (Memo. & Order, Mar. 29, 2013, Dkt. No. 197).  I will not relieve him of his obligation to track calculations before paying an award when he has slept on his right to do so for an extended time.  Finality in a case, especially one such as this, has its own value.

## V. CONCLUSION

For the reasons set forth more fully in Section III, I AFFIRM the decision of the bankruptcy court regarding compensation, except insofar as it approved the requested costs for deposition transcripts of Mr. Lowey and Mr. Georgiou in the

*Crawford* litigation, accordingly I ORDER the award decreased in the amount of $696.15.

For the reasons set forth more fully in Section IV, I have DENIED Mr. Crawford's unreasonably belated motion to correct a one dollar arithmetic error as one in which Mr. Crawford may be deemed to have acquiesced.

**_/s/ Douglas P. Woodlock_**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT